UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | | |
|---|---|---|---|
| EXXON MOBIL OIL CORPORATION, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:05-CV-102 |
| | ) | | (VARLAN/SHIRLEY) |
| MICHAEL F. THOMAS, d/b/a | ) | | |
| FINISH LINE ENTERPRISES, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## MEMORANDUM OPINION

This civil action is before the Court on plaintiff's Motion for Summary Judgment [Doc. 13], in which plaintiff seeks $187,292.86[1] on the grounds that there are no genuine issues of material fact as to defendant's breach of contract and plaintiff is therefore entitled to judgment as a matter of law. The Court has carefully considered the pending motion and supporting brief [Doc. 14] as well as the parties' response and reply memoranda [Docs. 20, 21, 28, 34, 35] in light of the applicable law. For the reasons set forth herein, plaintiff's motion for summary judgment will be granted.

---

[1]The amount requested in plaintiff's motion for summary judgment is $192,292.86. [Doc. 13 at 1.] However, in plaintiff's reply memorandum [Doc. 28], plaintiff amends its request to instead seek $187,292.86. The Court will discuss the details of this amendment more fully below.

**I.     Relevant Facts**

On July 10, 2002, plaintiff Exxon Mobil Oil Corporation ("Exxon") and defendant Michael F. Thomas entered into a Supply Agreement [Doc. 14, Ex. 1 ("Supply Agreement")], through which Mr. Thomas agreed to purchase a minimum amount of lubricant products per year from Exxon for various locations of his business, Finish Line Enterprises. [Supply Agreement at 1]. On August 1, 2002, Exxon and Mr. Thomas entered into a Reimbursement Agreement [Doc. 14, Ex. 2 ("Reimbursement Agreement")], through which Exxon agreed to loan Mr. Thomas $295,000 to enable him to acquire equipment necessary for the handling, storing, and dispensing of the lubricant products purchased under the Supply Agreement. [Reimbursement Agreement at 1.] Like the Supply Agreement, the Reimbursement Agreement established a minimum amount of lubricant products Mr. Thomas was required to purchase each year and provided that the loan made to Mr. Thomas would be reduced by $0.702 for each gallon of lubricant purchased under either the Supply or Reimbursement Agreement. [Reimbursement Agreement at ¶¶ 2-3.] The Reimbursement Agreement further provided that Mr. Thomas would be required to reimburse Exxon for any funds not amortized through the purchase of lubricant products and that default under the Supply Agreement would result in default under the Reimbursement Agreement, thereby triggering immediate repayment of all sums owed under both agreements. [*Id.* at ¶¶ 3, 5.] Both of these agreements were subsequently amended by the parties on March 1, 2004 to reduce the amount of lubricants Mr. Thomas was required to purchased under each agreement. [Doc. 21 at ¶¶ 11-13.] Those amendments are not in dispute.

Also on March 1, 2004, the parties entered into a Three-Way Agreement [Doc. 14, Ex. 3 ("Three-Way Agreement")] with non-party Keene Financial Corporation ("Keene"). Through this agreement, Mr. Thomas agreed to release Keene from any contractual obligations related to the Finish Line premises located at 703 Parkway in Sevierville, Tennessee and Keene agreed to purchase lubricant products from Exxon. [Three-Way Agreement at 1.]

Exxon argues that Mr. Thomas defaulted under the Supply Agreement by failing to pay $37,466.50 for lubricant products supplied to him by Exxon. [Doc. 14 at 4.] Exxon further argues that, pursuant to paragraph 5 of the Reimbursement Agreement,[2] Mr. Thomas's breach of the Supply Agreement constitutes breach of the Reimbursement Agreement. [*Id.*] Mr. Thomas does not contest that he owes money under the Supply and Reimbursement Agreements, but argues that he is entitled to an off-set of $17,160.12 for amounts owed under the Supply Agreement [Doc. 21 at ¶ 15] and that "the balance is less than $100,000" for amounts owed under the Reimbursement Agreement [*id.* at ¶ 19].

Exxon filed suit in this Court on February 22, 2005, seeking to recover amounts owed to it under the Supply and Reimbursement Agreements. [Doc. 1.] On May 25, 2005, the Court entered an Agreed Conditional Order of Dismissal [Doc. 9], which dismissed this action conditioned upon Mr. Thomas's payment of certain amounts over a set period of time.

---

[2]Paragraph 5 of the Reimbursement Agreement states the following: "It is default of this Agreement if Borrower defaults under the Supply Agreement. Upon Borrower's default, ExxonMobil may terminate this Agreement and the Supply Agreement and the Unamortized Balance shall become immediately due and payable directly to ExxonMobil." [Reimbursement Agreement at ¶ 5.]

Mr. Thomas did not make all of the payments required by the Agreed Conditional Order of Dismissal and Exxon subsequently reopened this case.

**II.     Analysis**

   A.     <u>Standard of Review</u>

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing there is no genuine issue of material fact lies upon the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, and determine the

truth of the matter. *Id.* at 249. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

  B. <u>Plaintiff's Motion for Summary Judgment</u>

The parties do not dispute that Tennessee law applies to the interpretation of the two contracts at issue. Under Tennessee law, questions of contract interpretation are issues of law, *Doe v. HCA Health Servs. of Tennessee, Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001), and when the facts are not in dispute, the issues can be resolved on summary judgment. *See Standard Fire Ins. Co. v. Chester O'Donley & Assoc., Inc.*, 972 S.W.2d 1, 6 (Tenn. Ct. App. 1998). "The central tenant of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d (Tenn. 2002). Courts must interpret a contract as written, "rather than according to the unexpressed intention of one of the parties." *Sutton v. First Nat. Bank of Crossville*, 620 S.W.2d 526, 520 (Tenn. Ct. App. 1981). Furthermore, courts are not to make contracts for parties, but can only enforce the contract which the parties have made. *McKee v. Continental Ins. Co.*, 234 S.W.2d 830, 831 (Tenn. 1951). If a contract is plain and unambiguous, the meaning of that contract is a question of law and it is therefore the court's function to interpret the contract as written according to its plain terms. *Petty v. Sloan*, 277 S.W.2d 355 (Tenn. 1955); *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). A court must avoid rewriting an agreement under the guise of interpreting it,

*Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1998), and cannot relieve parties of their contractual obligations simply because these obligations later prove to be burdensome. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002).

Exxon present two arguments as to why it is entitled to summary judgment. First, Exxon argues that Mr. Thomas breached the Supply and Reimbursement Agreements and that Exxon has incurred damages as a result of his breach. Second, Exxon argues that Mr. Thomas would be unjustly enriched in the amount of $37,466.50 if he were allowed to keep the lubricant products supplied to him by Exxon without paying for them. The Court will address each of these arguments in turn.

1. Breach of Contract

Exxon argues that it is entitled to summary judgment for breach of the Supply and Reimbursement Agreements by Mr. Thomas because Mr. Thomas failed to pay amounts due to Exxon under the Supply Agreement and Exxon incurred damages, specifically, the amounts owed to it under the Supply and Reimbursement Agreements, as a result of this breach. [Doc. 14 at 5-7.] Mr. Thomas does not directly address this contention in his response and reply memorandum, but instead argues that Exxon is not entitled to summary judgment because "Defendant has not admitted breach of contract" [Doc. 34 at ¶ 1] and that there is a genuine question of material fact "as to the amount Defendant may owe Exxon where [sic] under the already document intensive records and the disputed setoffs...." [Doc. 34 at 5].

6

To state a claim for breach of contract under Tennessee law, a plaintiff must prove: (1) the existence of a contract; (2) breach of that contract; and (3) damages which flow from the breach. *Life Care Centers of America, Inc. v. Charles Town Associates Ltd. P'ship, LPIM, Inc.*, 79 F.3d 496, 514 (6th Cir. 1996). Here, Mr. Thomas does not dispute that he and Exxon entered into the Supply Agreement on July 10, 2002 [Doc. 21 at ¶ 1] and entered into the Reimbursement Agreement on August 1, 2002 [*Id.* at ¶ 3], thus fulfilling the first element of Exxon's prima facie case for breach of contract. Furthermore, in response to Exxon's assertion of the total amount owed to it by Mr. Thomas, Mr. Thomas admits that he owes an amount of money to Exxon, but that "the balance is less than $100,000." [*Id.* at ¶ 19, Doc. 34 at ¶ 2.] In this way, Mr. Thomas admits to both breaching the contracts with Exxon[3] and that damages have flowed from that breach.

The question remains, however, as to the exact terms of the Supply and Reimbursement Agreements, in as much as Mr. Thomas argues that Exxon did not fulfill its obligations owed to him under those contracts. Specifically, Mr. Thomas contends that a proposal letter sent to him on May 7, 2002 from Exxon was incorporated into the Supply and Reimbursement Agreements, and that Exxon breached those contracts by failing to grant Mr. Thomas the marketing and development funds referenced in the May 7 letter. Exxon argues that the May 7 letter was an offer or proposal that ultimately was not incorporated into the

---

[3] The Court notes that in addition to Mr. Thomas owing amounts under the Supply Agreement and Reimbursement Agreement, paragraph 5 the Reimbursement Agreement provides that "[i]t is default of this Agreement if Borrower defaults under the Supply Agreement." [Reimbursement Agreement at ¶ 5.]

Supply Agreement, as evidenced by that agreement's entire agreement clause. [Doc. 28 at 13-14.] Exxon further argues that the parol evidence rule bars consideration of the May 7 letter to the extend that Mr. Thomas seeks to use the letter to contradict the terms of the Supply Agreement [*Id.* at 14-15.]

First, the Court notes that, standing alone, the May 7 letter is not sufficient evidence that a contract was in existence between Exxon and Mr. Thomas prior to the execution of the Supply Agreement, which was reduced to writing on July 10, 2002. Both parties agree that the letter is an offer or "proposal letter," [Doc. 21 at ¶ 1, Doc. 28 at 13] and as such, it could only become an enforceable contract under Tennessee law if its terms were accepted by Mr. Thomas. *See, e.g., Doe v. HCA Health Services of Tennessee, Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (noting that "[a] contract must result from a meeting of the minds of the parties in mutual assent to the terms...."). However, neither party has presented any evidence that Mr. Thomas ever assented to this offer and therefore, there is no evidence that the May 7 letter resulted in the formation of a separate contract between Exxon and Mr. Thomas.

Thus, the only way the May 7 letter could have any bearing upon the Supply Agreement is if it was otherwise incorporated into that agreement, as Mr. Thomas argues it was. [Doc. 21 at ¶ 1.] At the outset, the Court notes that under the circumstances of this case, Mr. Thomas bears a heavy burden in seeking to have the Court consider the May 7 letter as part of the Supply Agreement. Under Tennessee law, courts begin with the presumption that a written contract embodies the entire agreement of the parties. *Simonton v. Huff*, 60 S.W.3d 820, 826 (Tenn. Ct. App. 2000). Here, this presumption is furthered by the Supply

Agreement's inclusion of an entire agreement, or integration, clause. Much like the parol evidence rule, an integration clause limits the evidence available to parties should a dispute arise over contract interpretation. It precludes a party from relying upon any alleged representations made prior to the execution of the contract containing the integration clause in interpreting that contract. *Pressman v. Franklin Nat. Bank*, 384 F.3d 182, 186 (6th Cir. 2004). Integration clauses are used by parties to a contract "to signal to the courts that the parties agree that the contract is to be considered completely integrated" and therefore are meant to "preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements in a proceeding in which a court interprets the document." *Security Watch, Inc. v. Sentinel Systems, Inc.*, 176 F.3d 369, 372 (6th Cir. 1999). A contract's inclusion of an integration clause "creates a strong presumption that a contract is as it purports to be, a fully integrated agreement" and "will conclusively establish that the contract is final and complete." 21 TENN. PRAC. CONTRACT LAW AND PRACTICE § 8:49 (2006).

Paragraph 18 of the Supply Agreement, entitled "Entire Agreement," states the following:

> This instrument (including the Reimbursement Agreement of even date herewith, and any other documents incorporated herein) contains the entire agreement covering the subject matter, and supersedes any prior supply agreement between the parties relating to the Marketing Premises. THERE ARE NO ORAL UNDERSTANDINGS, REPRESENTATION OR WARRANTIES AFFECTING THIS AGREEMENT WHICH ARE NOT FULLY SET FORTH HEREIN.

[Supply Agreement at ¶ 18 (emphasis in original).] In this circumstance, the plain language of the integration clause makes it clear that the parties intended the Supply Agreement,

9

Reimbursement Agreement, and "any other documents incorporated herein" to constitute the entire and only agreements applying to Mr. Thomas. The Court has carefully examined the Supply Agreement and the only documents incorporated into it are two attachments to the contract, Attachment A and Attachment B. Attachment A sets forth the addresses and identifying numbers of the six Finish Line premises to which the Supply Agreement applies. [Supply Agreement at 7.] Attachment B is a pricing list for the products to be bought by Mr. Thomas. [*Id.* at 8.] There are no references to the May 7 letter or its contents and as the clause explicitly states, any other agreements in existence between the parties were superseded by this one. Accordingly, the Court finds that the Supply Agreement is final and complete and that the May 7 letter is not intended to be a part of this contract. Therefore, Exxon could not have breached the Supply or Reimbursement Agreements by failing to adhere to any promises made in the May 7 letter, as Mr. Thomas alleges.

Mr. Thomas, however, submits four arguments as to why his breach should be excused. He argues (1) that he was "induced" by the May 7 letter to enter into the Supply Agreement with Exxon [Doc. 21 at ¶ 16]; (2) that amounts allegedly owed to him by Keene, the party to the Three-Way Agreement who is a non-party to this lawsuit, somehow undercut Exxon's breach of contract claim [*Id.* at ¶ 15, Doc. 34 at ¶ 3]; (3) that assumption agreements concerning four of the premises to which the Supply Agreement applies impact the amount Mr. Thomas owes Exxon [Doc. 21 at ¶ 19; Doc. 34 at ¶¶ 5-6]; and (4) that Mr. Thomas' receipt of a claims form regarding a class action settlement against Exxon suggests that there is a genuine issue of material fact as to Exxon's breach of contract claim in this case [Doc.

10

34 at ¶ 4]. As to Mr. Thomas's allegation of inducement, beyond the bare assertion of it, he has presented no evidence to substantiate this claim. As to his claims concerning Keene, the Court notes that Keene is not a party to this litigation and while Keene may owe money to Mr. Thomas by virtue of agreements existing between them,[4] such claims do not affect Mr. Thomas's breach of the contracts in place between him and Exxon. With regards to the alleged assumption agreements, Mr. Thomas has admitted that any such agreements were "never completed by Exxon." [Doc. 34 at ¶ 5]. Therefore, the Court is unable to see how these unexecuted agreements could impact the pending motion for summary judgment. Lastly, the Court similarly cannot understand how the claims form Mr. Thomas received is applicable to this lawsuit. Thus, while Mr. Thomas attempts to raise a number of affirmative defenses, he ultimately fails to substantiate any of them in a way sufficient to avoid a grant of summary judgment for Exxon.

To summarize, Mr. Thomas both admits to the existence of contracts between him and Exxon and that he defaulted on payments due to Exxon under the Supply Agreement, thereby triggering a breach of the Reimbursement Agreement and requiring immediate repayment of amounts owed to Exxon under both of those agreements. Additionally, there is no evidence that Exxon breached the Supply or Reimbursement Agreements. Accordingly, the Court will grant Exxon's motion for summary judgment.

---

[4]Exxon suggests that Mr. Keene has satisfied any amounts he owed to Mr. Thomas, both through direct payments to Mr. Thomas [Doc. 28 at 8-10] and through assumption of debts of Mr. Thomas [*id.* at 10-11].

11

2. <u>Unjust Enrichment</u>

Because the Court has determined that summary judgment should be granted on the grounds of breach of contract, the Court need not address Exxon's argument that summary judgment should be granted for it on the grounds of unjust enrichment.

3. <u>Amount Owed</u>

Much of Exxon's memoranda in support of its motion for summary judgment are devoted to substantiating the amount of money Mr. Thomas owes it as a result of his default under the Supply and Reimbursement Agreements. The Court notes that Mr. Thomas's only contention with regards to the total amount owed to Exxon is that he owes them some amount less than $100,000, [Doc. 21 at ¶ 19], but submits no documentation or evidence indicating why that is the case or what the exact amount owed should be.

In its memorandum in support of its motion for summary judgment, Exxon argues that Mr. Thomas owes $192,292.86, an amount comprised of $37,466.50 owed under the Supply Agreement for lubricant products supplied by Exxon and $154,826.36 owed under the Reimbursement Agreement to repay unamortized loan amounts. [Doc. 14 at 6-7.] With regards to the amount owed under the Supply Agreement, Mr. Thomas contends that Exxon products purchased by Keene were erroneously charged to his account and that he is therefore entitled to a set-off of $17,160.12. [Doc. 21 at ¶ 15.] In support of this contention, Mr. Thomas has filed an 85-page attachment that contains, among other documents, a letter from Exxon requesting that Mr. Thomas pay the $37,204.46 balance, as well as a number of invoices reflecting amounts owed by Finish Line Enterprises for lubricant products

12

purchased. [Doc. 21, Ex. B.] Given that Mr. Thomas does not explain what this attachment is meant to demonstrate, it is unclear how this attachment supports Mr. Thomas's argument that he should be granted a set-off for amounts owed to Exxon under the Supply Agreement. Exxon, however, explains that invoices for certain Exxon products, which are included in the above-described attachment, were charged to Mr. Thomas's account after Keene had taken over the Finish Line premises in Sevierville, Tennessee, but that pursuant to an agreement between Keene and Mr. Thomas, Keene agreed to pay Mr. Thomas for each of those invoices. [Doc. 28 at 8.] Exxon then presents evidence showing that Keene reimbursed Mr. Thomas for $4,751.68 of the invoices with cash and refunded the remainder by covering various debts of Mr. Thomas's. [*Id.* at 9-10.] Mr. Thomas does not contest this explanation nor the amount he owes to Exxon under the Supply Agreement in his supplemental response brief, but simply argues that "a recent affidavit of Doug Keene...creates a question of fact that Mr. Doug Keene did not reimburse Defendant for every product delivered to 703 Parkway billed to Defendant." [Doc. 34 at ¶ 3.] As mentioned above, the Court can find no reason why a dispute between Mr. Thomas and Keene over amounts owed relieves Mr. Thomas of his financial obligations under the Supply Agreement to which Exxon – and not Keene – is a party. Accordingly, the Court finds that Mr. Thomas owes Exxon $37,466.50 due to his default on the Supply Agreement.

As to the amounts owed under the Reimbursement Agreement, Exxon admits in its reply memorandum that Mr. Thomas made payments to Exxon totaling $49,500 after the Court entered its Agreed Conditional Order of Dismissal, thereby reducing the total amount

owed by Mr. Thomas under the Reimbursement Agreement from $154,826.36 to $149,826.36. Mr. Thomas contends that he should be given credit for payments made in the amount of $52,000. [Doc. 21 at ¶ 18]. Exxon explains this $2,500 discrepancy as arising from a dispute over whether payment was ever made on a $2,500 check drawn on the account of Finish Line Enterprises and dated November 10, 2005. [Doc. 28 at 5-6.] Exxon states that while it received this check, it never received payment for this check after being notified by Mr. Thomas's lawyer that there were insufficient funds in the account to cover the check in question. [*Id.* at 6.] Out of an abundance of caution and because the Court is required to construe the facts in the light most favorable to the non-moving party, the Court will assume that payment was made on the November 10 check and will therefore reduce the amount owed by Mr. Thomas to Exxon under the Reimbursement Agreement to $147,326.36. Accordingly, the Court finds that the total amount owed by Mr. Thomas to Exxon under the Supply and Reimbursement Agreements to be $184,792.86.

### III. Conclusion

For the reasons set forth herein, plaintiff's Motion for Summary Judgment [Doc. 13] is **GRANTED**.

The Clerk is directed to enter judgment accordingly.

s/ Thomas A. Varlan  
UNITED STATES DISTRICT JUDGE